UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DANE CHARLES ARREDONDO,<br><br>Defendant. | 5:19-CR-50042-JLV<br><br>REPORT AND RECOMMENDATION REGADING DEFENDANT'S MOTION TO SUPPRESS (DOC. 21) |

Pending is Defendant's Motion to Suppress (Doc. 21).  A hearing was held on Wednesday, September 4, 2019.  Defendant was personally present and represented by his attorney of record, Thomas E. Harmon V.  The Government was represented by the Assistant United States Attorney Gina S. Nelson.  One witness testified at the hearing, and one exhibit was received into evidence. Supplemental briefing concluded on September 20, 2019.  Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

**RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be granted.

## JURISDICTION

Defendant is charged in an Indictment with Health Care Fraud in violation of 18 U.S.C. § 1347; Acquiring Controlled Substances by Fraud in violation of 21 U.S.C. § 843(a)(3); and Possession of Controlled Substances in violation of 21 U.S.C. § 844.  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

On January 5, 2019 Pennington County Sheriff's Deputy Eric Fenton was dispatched to a "verbal disturbance" which involved slamming doors and a female crying and screaming.  (Doc. 38 at p. 5).  When Deputy Fenton arrived, he did not hear any signs of a disturbance, but peered through the front door window to the home and saw a spent rifle shell casing on a step inside the house.  Id. at p. 6.  Deputy Fenton rang the doorbell and David Arredondo, the defendant's brother, answered the door.  Id. at p. 7.  David Arredondo opened the door approximately 60 degrees.  Id.  Deputy Fenton asked if everything was alright, to which David Arredondo replied in the affirmative.  (Ex. 1 at 2:57-3:00).  Deputy Fenton then asked if he had an argument, to which David Arredondo again replied in the affirmative.  Id. at 3:00-3:12.  Deputy Fenton asked if he could step inside the residence, and David Arredondo replied, "It's not my house."  Id.  When asked whose house it was, David Arredondo stated that the house belonged to his brother.  Id.  Deputy Fenton asked who else was in the home and David Arredondo stated that his girlfriend was present.  Id.

2

When asked if Deputy Fenton could speak with the girlfriend, David Arredondo replied that she was "laying on the floor." Id. at 3:15-3:18.

Body camera footage shows Deputy Fenton pushing open the front door while questioning, "She's on the floor?" Id. at 3:18-3:23. Deputy Fenton testified that when he pushed the door open he could see a female's feet sticking out at the bottom of the steps, in a position where the individual would have been laying on their back, but could not see the whole body. (Doc. 38 at p. 8). David Arredondo again repeated that his girlfriend was on the floor, stating she is "really drunk." When Deputy Fenton asked David Arredondo to come downstairs with him, he again resisted, stating the house belonged to his brother. (Ex. 1 at 3:23-3:52). Deputy Fenton testified at this moment David Arredondo was not free to ignore his command to allow Deputy Fenton to enter the home to perform a wellness check on the female. (Doc. 38 at p. 8, 23).

After following David Arredondo downstairs, Deputy Fenton called out to the female and asked if she was alright. (Ex. 1 at 4:06-4:27). The female's voice was faintly heard on the body camera footage and David Arredondo relayed to the female that law enforcement was present. Id. at 4:46-4:48. Deputy Fenton then asked, "Are you injured at all?" to which the female responded, "No" and Deputy Fenton then questioned why she was laying on the floor. Id. at 4:48-5:01. David Arredondo and Deputy Fenton were still at the bottom of the stairs in the basement and the female was located off camera in a dark room. Id. When David Arredondo ignored Deputy Fenton's request to

stay in the hallway, Deputy Fenton placed him in handcuffs and patted him down for weapons.  Id. at 5:11-5:36.

Another voice in the audio, later determined to be the Defendant, was heard on camera and the footage showed Dane Arredondo in a dark bedroom, and the female, later determined to be Ashley Richards, still laying on the floor in the same bedroom as Dane Arredondo.  Id. at 5:36-5:45.  Ashley Richards then came to the doorway of the bedroom and repeated three times, "No, he is not a threat to me." Id. at 6:15-6:29.  Deputy Fenton testified he likely did not hear these statements by Ms. Richards because at the same time he was radioing dispatch.  (Doc. 38 at p. 32).  The video verifies Deputy Fenton was speaking on the radio at the same time Mr. Richards made the statements and both David Arredondo and Dane Arredondo were also speaking at the same. (Ex. 1 at 6:15-6:29).  Shortly after handcuffing David Arredondo, Deputy Fenton confirmed David Arredondo's name with the identification located in his wallet.  Id.

When other deputies arrived, Dane Arredondo was placed in handcuffs. Id. at 7:23-8:05.  Deputy Fenton asked what happened, to which David Arredondo replied, there had been an argument and Ms. Richards ran down the stairs and fell.  Id. 9:18-9:15.  Deputy Fenton then entered the bedroom while both David and Dane Arredondo were handcuffed in the hallway.  Id. at 9:38-9:45.  Ms. Richards is heard crying on camera and Deputy Fenton asked if she has any injuries, to which she responded in the negative.  Id.  While Ms. Richards was still sitting on the floor, Deputy Fenton shined a light on her and

pulled her hair back out of her face to check for injuries, none of which were noted.  Id. 9:45-9:58.  Deputy Fenton asked why the rifle casing was on the floor upstairs, but did not receive a clear answer from either David or Dane Arredondo.  Id. 10:05-10:27.  Deputy Fenton asked if they were planning on going to bed for the evening, to which David and Dane Arredondo both responded in the affirmative.  Id. at 10:40-10:46.

Law enforcement then lead both David and Dane Arredondo upstairs to confirm Dane Arredondo's identification in his wallet.  Id. at 10:50-11:51.  When law enforcement reviewed his identification, they questioned Dane Arredondo about providing a false name of Dane Richards before.  (Ex. 1 at 11:51-13:38).  Dane Arredondo was then escorted outside.  Id.  Deputy Fenton testified that at this point the "exigency [wa]s gone" and law enforcement was still investigating whether a domestic violence may have taken place.  (Doc. 38 at p. 36).  Deputy Fenton sat David Arredondo on the couch upstairs after checking two couch cushions to make sure no weapons were located underneath.  (Ex. 1 at 13:50-14:05.  While standing in the living room, Deputy Fenton discovered several glass medicine vials.  Id. at 15:22-15:40.  David Arredondo stated that Dane Arredondo "is a paramedic and has a license."  Id.  Deputy Fenton read the Ketamine label aloud from one vial and asked David Arredondo if Dane Arredondo had a prescription for Ketamine.  Id. at 15:40-45.  Deputy Fenton testified that he was unsure if the vials were controlled substances, so he pulled out his phone and Googled the names on the vials.

(Doc. 38 at p. 16).  After searching downstairs, Deputy Pond returned upstairs with what he alleged was a vial of Fentanyl.  (Ex. 1 at 23:16-23:25).

## DISCUSSION

### I.   Search and Seizure of Vials was Illegal

Arredondo argues that the physical evidence, *i.e.* the vials, seized in this case were taken in a warrantless search that violates his rights under the Fourth Amendment.  (Doc. 21; Doc. 22).  The government argues that its search and seizure in this case was justified by either the exigent circumstances or community caretaker function exceptions to the warrant requirement.  (Doc. 32).  The burden is on the government to establish that an exception to the warrant requirement applies.  Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

### a.  Exigent Circumstances had Ceased when Search was Conducted

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  U.S. Const. amend. IV.  "The text of the Amendment thus expressly imposes two requirements.  First, all searches and seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."  Kentucky v. King, 563 U.S. 452, 459 (2011).  Although the Fourth Amendment does not specify the circumstances under which a warrant must be obtained, "[i]t is a 'basic principle of Fourth Amendment law that

6

searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal citation omitted).  The presumption may be overcome in certain circumstances, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Id.  One of the recognized exceptions to the warrant requirement is the exigent circumstances exception.  Mincey v. Arizona, 437 U.S. 385, 394 (1978).  Absent exigent circumstances, the threshold of one's home "may not be reasonably crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980).

"The [exigent circumstances] exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." United States v. Amburn, 412 F.3d 909, 915 (8th Cir. 2005) (quoting United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996)).  Whether this exception to the warrant requirement has been shown is objectively evaluated, on the basis of what a "reasonable, experienced officer would believe." Id. (quoting United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003)).  An officer's subjective motivations are irrelevant.  United States v. Valencia, 499 F.3d 813, 815 (8th Cir. 2007) (citing Brigham City, 547 U.S. at 403).

The Supreme Court has identified "emergency aid" as being one of the various exigencies which may justify the warrantless entry into a home. Michigan v. Fisher, 558 U.S. 45, 48 (2009).  The emergency aid exception can be based upon the need to assist persons who are seriously injured or

7

threatened with such injury.  <u>Valencia</u>, 499 F.3d at 815 (citing <u>Brigham City</u>, 547 U.S. at 403 (holding that under the emergency aid exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury")).

Here, Mr. Arredondo does not contest that Deputy Fenton was acting within the scope of the Fourth Amendment when he originally entered the home to check on the wellbeing of Ms. Richards.  (Doc. 38 at p. 51).  He does, however, contest the search which resulted in discovery of the vials.  <u>Id.</u>  Mr. Arredondo's position is that once Deputy Fenton confirmed that Ms. Richards was not injured, and both David and Dane Arredondo were in handcuffs, that the exigent circumstances had ceased.  Deputy Fenton testified that after David and Dane Arredondo were escorted upstairs, but before the vials were discovered, the "exigency [wa]s gone."[1]  <u>Id.</u> at p. 36.  Deputy Fenton also testified that once the exigent circumstances had ceased, the investigation regarding the potential domestic violence was still ongoing.  <u>Id.</u> at p. 36.  This court has previously recognized that,

---

[1] The government cites to <u>United States v. Uscanga-Ramirez</u> to stand for the proposition that officers responding to a domestic violence call were objectively reasonable in disbelieving the suspect who denied possession of gun when other information indicated safety concern existed. (Doc. 32 at p. 8) (citing <u>United States v. Uscanga-Ramirez</u>, 475 F.3d 1024 (8th Cir. 2007). However, <u>Uscanga-Ramirez</u>, as distinguished from the present case, involved exigent circumstances because Defendant was still a threat to his own safety at the time of the search. <u>Id.</u> at 1029.  Although originally responding to a domestic violence report, in <u>Uscanga-Ramirez</u>, officers were made aware by Defendant's wife that he had locked himself in a bedroom with a gun.  <u>Id.</u> at 1026.  Officers found Defendant locked in his room and made the reasonable decision to "quickly conduct a limited search under the pillow for the gun" which was within Defendant's reach and where the officer "reasonable perceived a risk of danger to everyone in the room." <u>Id.</u> at 1029.  In the present case, unlike <u>Uscanga-Ramirez</u>, Deputy Fenton admitted the exigency had passed before the search was conducted, both men were in handcuffs, and it had been determined that the female in the home was uninjured.

> domestic violence situations are of particular concern to law enforcement because of the "combustible nature" of the disputes. . . . However, there is no per se domestic violence exception to the warrant requirement of the Fourth Amendment. The fact domestic violence occurred does not, in and of itself, create exigent circumstances. There must be something more, and here, there is not.

United States v. LaDeaux, No. CR 11-50128-JLV, 2012 WL 1609913, at *3 (D.S.D. May 8, 2012). Because the exigent circumstances had ceased by the time the vials were seized, as admitted by the government's only witness provided at the hearing, the government has failed to meet their burden that the exception to the warrant requirement applies.

### b. Community Caretaker Function had Ceased when Search was Conducted

The community caretaker function is another recognized exception to the warrant requirement. "One situation in which an officer may act under the community caretaker doctrine is when 'the officer has a reasonable belief that an emergency exists requiring his or her attention.'" United States v. Harris, 747 F.3d 1013, 1017–18 (8th Cir. 2014) (quoting Burke v. Sullivan, 677 F.3d 367, 371 (8th Cir. 2012)). "When police must make a split-second decision in the face of an emergency to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act, addressing the potential danger to protect the public, we have reasoned that officers are expected to act. Harris, 747 F.3d at 1017–18 (internal citation omitted).

The Eighth Circuit has provided an analytical framework for the community caretaker doctrine. First, the court must determine the capacity in which law enforcement was acting, i.e. whether officers were acting as a

9

community caretaker or to investigate a crime.  United States v. Smith, No. 4:13-CR-40139-KES, 2014 WL 6080205, at *9 (D.S.D. Nov. 13, 2014), aff'd, 820 F.3d 356 (8th Cir. 2016) (quoting Harris, 747 F.3d at 2018; United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006).  "Second, the court 'must weigh the government's interest in the officers' actions against [the defendant's] right to be free from government intrusion.'"  Smith, at *9 (internal citation omitted).  "Third, if the initial intrusion is justified, the court 'must assess whether the scope of the [entry] was carefully tailored to satisfy the purpose of the [intrusion].'"  Id. (internal citation omitted).

With regards to law enforcement acting in a community caretaker function, the Eighth Circuit has noted:

> Police officers, unlike other public employees, tend to be "jacks of all trades," who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law.  Cady v. Dombrowski, 413 U.S. 433, 441 (1973).  These activities, which are undertaken to help those in danger and to protect property, are part of the officer's "community caretaking functions."  Id.

Quezada, 448 F.3d at 1007.  These non-investigatory search and seizures are permitted in "certain limited situations" when performed with the purpose to "help those in danger."  Smith, 820 F.3d at 360 (citing Harris, 747 F.3d at 1017; Quezada, 448 F.3d at 1007).

On the other hand, when law enforcement is acting to investigate and uncover crime, "a police officer acts at the core of his or her duties" and "it is to these types of actions that the warrant clause of the fourth amendment is directed."  Quezada, 448 F.3d at 1007 (citing Johnson v. United States, 333

U.S. 10, 14 (1948)). A warrantless entry to investigate and uncover crime "must be justified by probable cause to believe that a crime has been or is being committed and the existence of what are called exigent circumstances." Quezada, 448 F.3d at 1007. However, the Supreme Court has held that reasonable belief, a less exacting standard than probable cause, is the appropriate measure when determining whether an officer may enter as a community caretaker. Id. (internal citations omitted).

Here, the government has cited to both Quezada and Harris to support their contention that officers were conducting a community caretaker function. (Doc. 32 at p. 9-12). However, both cases are distinguishable from the present set of facts. In Quezada, a deputy arrived at a home to serve papers in a civil action. Quezada, 448 F.3d at 1006. After knocking on the door, the deputy realized the door was not completely latched, the lights were on, and the television was playing. Id. The deputy called out, and after receiving no answer, entered the home to check on the safety of the occupants. Id. After entering the home, the deputy saw a man laying on the ground with a shotgun protruding from beneath him. Id. The deputy removed the shotgun and woke the man up. Id. That man was later charged as a felon in possession of a firearm and moved to suppress the evidence. Id. at 1007. The court held the community caretaker function applied and denied the motion. Id. In Quezada, the deputy discovered the physical evidence while still in the process of checking on the welfare of the occupants inside the home. Id. at 1006.

11

In Harris, law enforcement was called to a report of a man asleep on a bench at a bus station where concealed carrying of firearms was prohibited by law. Harris, 747 F.3d at 1016. When officers arrived, they noticed the man's legs propped up on the bench and the handgun "sliding" out of his pants pocket. Id. at 1017. Officers were concerned the man might wake up and attempt to use the handgun, or that the handgun could fall from the pants pocket and accidently discharge. Id. Officers removed the handgun from the man's pocket before waking him up. Id. Harris was charged as a felon in possession of a firearm and moved to suppress the evidence. Id. at 1016. The court denied the motion on the grounds of the community caretaker function exception. Id. Similar to Quezada, the physical evidence in Harris was found on the Defendant's person. Also similar in both cases, law enforcement discovered the physical evidence while still in the process of responding to an ongoing potential danger to the community.

Both Quezada and Harris are distinguishable from the present case. Here, the physical evidence was not seized in relation to a continuing danger associated with the reported verbal disturbance. Once it was determined that Ms. Richards was not injured, and both men were taken upstairs, there was no ongoing possibility of danger. Police were not reacting to a "split-second decision to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act" as they were in Quezada and Harris. Harris, 747 F.3d at 1017–18 (internal citation omitted). Rather, the evidence was discovered after

both men had been handcuffed and one man had already been escorted from the home.

As noted above, it is undisputed by Mr. Arredondo that law enforcement properly entered the home upon arrival to check on the welfare of Ms. Richards.  Again, Mr. Arredondo's contention is that any community caretaker function had ceased by the time the vials were seized.  The government argues "[t]he intrusion into the home at no time exceeded the permissible bounds of the entry." (Doc. 32 at p. 12).  Yet by the government's own admission, "[i]t was only when the males were separated from Richards . . . that the controlled substance vials were observed . . . ." Id.

It can hardly be stated that law enforcement was acting in a limited manner "totally divorced from the detection, *investigation*, or acquisition of evidence relating to the violation of criminal law."  Quezada, 448 F.3d at 1007 (internal citation omitted) (emphasis added).  Contrary, Deputy Fenton testified[2] that during the time period before the vials were found, the exigency had ceased, but law enforcement was "still trying to *investigate* whether domestic violence may have taken place." (Doc. 38 at p. 36) (emphasis added). See also (Doc. 37) (emphasis added) (stating that David Arredondo was brought up stairs "during the time when deputies separated the parties to *investigate* whether a possible domestic violence occurred").  Because the community

---

[2] In addition to Deputy Fenton's testimony that the exigency was gone, his statements to David and Dane Arredondo on the body camera footage before the vials were seized indicate no ongoing emergency persisted.  "Well, are you guys going to go to bed then, are you done for the night?" Id. at 10:40-46.  "Well, if nothing happened here, we will be out of here shortly, just be patient." Id. at 15:03-15:09.

caretaker function had ceased, and an investigatory procedure had taken its place, the government has failed to meet their burden that the exception to the warrant requirement applies.

### c. Plain View Exception

The government argues that once they entered the home legally, they were permitted to seize items in plain view.  (Doc. 32 at p. 6).  It is undisputed that officers entered the home legally, however, this court has held the officers illegally extended their stay beyond the permissible bounds of the exigent circumstances or community caretaker function exceptions.  See supra Section I. a-b.

> Under the plain view doctrine, police may seize an object without a warrant if (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.

Kleinholz v. United States, 339 F.3d 674, 677 (8th Cir. 2003) (internal citation omitted).  The government must meet its burden regarding *all three* prongs before the plain view doctrine is permitted.  Although law enforcement arrived inside the home legally, the court finds that the first and third prongs are not met because law enforcement stayed in the home and conducted the search after it had been determined that there was no longer an ongoing emergency.

During the hearing, the Court also engaged in discussion whether the vials incriminating character was immediately apparent, as Deputy Fenton testified to having to conduct a Google search regarding the names listed on several of the vials to determine if they were controlled substances.  (Doc. 38 at

14

p. 16, 53-55).  See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (internal citations omitted) (emphasis added) ("If, however, the police lack probable cause to believe that an object in plain view is contraband *without conducting some further search of the object—i.e.,* if 'its incriminating character [is not] "immediately apparent,"' . . . —the plain-view doctrine cannot justify its seizure.").  However, the court need not resolve plain view doctrine issues, because the government has failed to meet its burden to demonstrate an exception to the warrant requirement existed at the time of the search and seizure of physical evidence.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 21) be granted.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 16th day of October, 2019.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge