UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DANE CHARLES ARREDONDO,<br><br>Defendant. | CR. 19-50042-JLV<br><br>ORDER |

**INTRODUCTION**

A grand jury charged defendant Dane Charles Arredondo with health care fraud, acquiring controlled substances by fraud, and possession of controlled substances. (Docket 1). Pending before the court are defendant's motion to suppress evidence from a January 5, 2019, search of his home and his motion to dismiss the indictment or, in the alternative, for a bill of particulars. (Dockets 21 & 23). The government opposes the motions. (Dockets 32 & 33).

The motions were referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order. (Docket 25). The magistrate judge conducted an evidentiary hearing on the motion to suppress on September 4, 2019. (Docket 35). She took testimony from one witness and received one exhibit into evidence. (Dockets 35 & 36). The parties filed post-hearing briefing. (Dockets 37 & 39). The magistrate judge then issued two reports and recommendations ("R&Rs") concluding the motion to dismiss should be denied, but that the motion

to suppress should be granted.   (Docket 84).   The government timely objected to the suppression R&R.   (Docket 46).   Defendant did not object to either R&R and did not file a response to the government's objections.

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   Id.   The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   Id.   For the reasons given below, the court adopts the suppression R&R in part, as modified by this order, and rejects it in part.   The court grants defendant's motion to suppress.   The court further adopts the dismissal R&R in full and denies the motion to dismiss.

## I.     Suppression R&R

### A.     Government objections

The government did not specifically object to any of the magistrate judge's factual findings.   However, the statement of facts in its objections to the R&R is considerably more detailed than the magistrate judge's findings of fact.   (Docket 46 at pp. 1-9).   The court's analysis also relies on facts the magistrate judge did not specifically find.   The court accordingly sets forth its own findings of fact.

The government made three legal objections.   As summarized and reordered by the court, the objections assert:

1.     Law enforcement's warrantless entry into defendant's home was lawful pursuant to the community caretaker exception to the Fourth Amendment's warrant requirement. (Docket 46 at pp. 21-24).

2.     Assuming law enforcement lawfully entered defendant's home under the exigent circumstances exception, the end of the exigency did not require officers to depart the home before observing and seizing vials in plain view. Id. at pp. 14-20.

3.     Law enforcement's warrantless seizure of the vials was lawful under the plain view doctrine. Id. at pp. 9-14.

The court overrules the first objection as moot, sustains the second objection on different grounds and overrules the third objection.

**B.**     **Facts**

On January 5, 2019, a woman called the police after hearing "slamming doors" and "a woman screaming and crying" at 5435 Williams Street, in Rapid Valley, South Dakota.[1] (Docket 38 at p. 5). The reporter informed dispatch during the call that she heard no weapons. Id. at p. 19. Pennington County Deputy Sheriff Eric Fenton ("Deputy Fenton") was dispatched to respond to the disturbance at approximately 10 p.m. that evening.[2] Id. at p. 5.

---

[1]Although the government characterized the home at issue here as located in Rapid City, it is actually in the unincorporated suburban area of Rapid Valley, to the east of Rapid City municipal limits. (Docket 38 at p. 5).

[2]Deputy Fenton was the only witness at the suppression hearing. (Docket 35). The magistrate judge did not make an explicit credibility finding regarding his testimony, but did rely on his testimony in making crucial legal findings. See Docket 41 at pp. 8-9 (concluding, based on Deputy Fenton's testimony, that exigency ceased before discovery of vials). The court notes inconsistencies at points between Deputy Fenton's testimony and the body camera video, but declines to make an express credibility finding because no legal matter in its resolution of the pending motions depends solely on his credibility.

Deputy Fenton was the first officer to arrive on scene. (Docket 38 at p. 6). He activated a body camera before approaching the home. Suppression Hearing Ex. 1. The magistrate judge received the body camera video, approximately 41 minutes in length, into evidence. (Docket 36).

Shortly after approaching the home, Deputy Fenton reported on his radio that he observed a rifle casing on the stairs through the window of the front door. Ex. 1 at 05:07:26.[3] The video does not show the view into the house through the window, but Deputy Fenton later picked up what appears to be a rifle casing from the stairs on camera. Id. at 05:17:27. He did not collect the casing as evidence. (Docket 38 at p. 20). Deputy Fenton rang the doorbell and a male, later identified as defendant's brother, David Arredondo, answered the door, opening it only slightly.[4] Ex. 1 at 05:09:08. Deputy Fenton testified that Mr. Arredondo "was highly intoxicated" when he opened the door because "he was kind of slurring his speech and he didn't seem very coherent." (Docket 38 at p. 7).

Deputy Fenton asked Mr. Arredondo if "you guys" were having an argument and he responded yes. Ex. 1 at 05:09:08. Deputy Fenton asked to enter the house and Mr. Arredondo informed him the house belonged to his

---

[3]The court cites to the video using the timestamps created by the body camera device or software, located in the upper right corner of the footage.

[4]The court refers to David Arredondo as "Mr. Arredondo" throughout the remainder of this order. To avoid confusion, the defendant, Dane Arredondo, is referred to solely as "defendant."

brother.  Id. at 05:09:17.  Deputy Fenton then asked who was in the house.
Mr. Arredondo stated his girlfriend was in the house and that she was on the
floor.  Id. at 05:09:26.  Deputy Fenton then pushed the front door more fully
open and entered the house.[5]  Id. at 05:09:30.

As seen on the video, the home has two levels.  The front door opens onto
a small landing, with stairways leading to the upper and basement levels.  Id. at
05:09:40.  The basement contains five doors, two of which appear to open into a
utility closet.  Id. at 05:10:06, 05:15:39.  The door closest to the stairs leads to
a bedroom.  Id. at 05:11:51.  Law enforcement later determined defendant
leased the home.  Id. at 05:25:25.

Mr. Arredondo stated his girlfriend was very drunk and told Deputy
Fenton he was not invited into the house.  Id. at 05:09:38.  Deputy Fenton
testified he was able to see down the stairs into the basement at that point from
the landing.  (Docket 38 at p. 8).  He observed a "woman's feet . . . [from[ maybe
the knee down" on the basement floor.  Id.  The rest of her body was not visible.
Id.  The video does not show the woman on the floor, but it does record Deputy

---

[5]Deputy Fenton at first testified Mr. Arredondo pushed the door open, but
that is contradicted by the video.  (Docket 38 at p. 8).  Defense counsel
confronted Deputy Fenton with this inaccuracy during the suppression hearing,
causing him to correct his testimony.  Id. at pp. 21-22.

Fenton contemporaneously relaying that information to dispatch.[6]   Ex. 1 at

05:10:14.   Upon reaching the bottom of the stairs, Deputy Fenton opened the

door closest to the stairs and asked if the woman, later identified as Ashley

Richards, was injured and why she was lying on the floor.   Ms. Richards is

heard responding that she is not injured and that she is lying on the floor

"because [she] want[s] to."   Id. at 05:10:28 – 05:11:10.

The video shows a man, later identified as defendant, sitting on a mattress

in the bedroom with Ms. Richards.   Id. at 05:11:51.   Defendant asked Deputy

Fenton three times if they could go upstairs and he responds that they will once

another officer arrives.   Id. at 05:12:01 – 05:13:00.   During this time, Ms.

Richards, apparently intoxicated, audibly says three times that "he is not a

threat to me."   Id. at 05:12:25 – 05:12:40.   Deputy Fenton testified he "probably

didn't hear" her because he was talking on the radio at the time.   (Docket 38 at

pp. 31-32).   Approximately a minute later, two other officers enter the house.

Ex. 1 at 05:13:33.   As the officers arrived, defendant asked twice more if they

could go upstairs.   Id. at 05:13:27 – 05:13:41.

---

[6]Mr. Arredondo is later recorded contesting Deputy Fenton's version of
events, arguing that he did not see Ms. Richards on the basement floor because
she was in the room with defendant.   Ex. 1 at 05:14:06.   The court need not
resolve this factual dispute because the defense concedes Deputy Fenton's
warrantless entry into the home was not unconstitutional.   See infra Section
I.C.1.

One of the backup officers was Deputy Matthew Pond.[7]   (Dockets 32 at p. 3 & 38 at p. 13).   No party called Deputy Pond as a witness or offered any arrest reports he authored into evidence, despite his clearly crucial role in the evening's events.   The court's recounting of Deputy Pond's actions is based on the body camera video, Deputy Fenton's testimony and the parties' evidentiary proffers in their briefing.

Deputy Fenton directed Deputy Pond to "get some ID on this dude," referring to defendant.   Ex. 1 at 05:13:42.   Deputy Pond immediately placed defendant into handcuffs, approximately 20 seconds after entering his home. Id. at 05:13:51.   The government did not explain why Deputy Pond restrained defendant, nor does the video show any obvious reason.   The officers placed defendant and Mr. Arredondo next to each other in the basement hallway.   Id. at 05:15:09.   After Deputy Pond handcuffed defendant, Deputy Fenton briefly searched the bedroom he was lying in, including by opening the closet door.   Id. at 05:14:59 – 05:15:10.   The video quickly panned around the room, showing items on the bedroom windowsill, none of which appear to be vials.   Id.

Deputy Fenton then asked if anyone else was in the house.   Both Mr. Arredondo and Ms. Richards stated there was not.   Id. at 05:15:10 – 05:15:14. Defendant hesitated in giving his last name to Deputy Pond.   Id. at 05:15:13. The video does not record defendant giving a last name, but Deputy Pond is

---

[7]Based on the uniform Deputy Pond was filmed wearing, the court presumes he is a Pennington County Deputy Sheriff.   Ex. 1 at 05:13:46.   No party provided evidence of Deputy Pond's law enforcement training or credentials.

recorded calling in the name "Dane Richards" to dispatch.   Id. at 05:15:34.

After calling the name in, Deputy Pond opened the doors to the utility closet and

the second room from the staircase and briefly searched the rooms.   Id. at

05:15:37.   Deputy Fenton asked Ms. Richards again if she was injured.   Upon

receiving a negative response, he visually examined her and pulled her hair back.

Id. at 05:15:45 – 05:16:04.   Ms. Richards appeared intoxicated, but there were

no visible injuries.   Id.

     After examining Ms. Richards, Deputy Fenton asked why there was a rifle

casing on the stairs.   Id. at 05:16:15.   Mr. Arredondo looked at defendant, who

told Deputy Fenton that he's a paramedic and that the casing was upstairs.   Id.

at 05:16:15 – 05:16:30.   Defendant did not answer Deputy Fenton's question.

Id.   Deputy Pond asked to see defendant's identification.   Defendant stated his

wallet was upstairs and began walking toward the stairs.   Id. at 05:17:05.

After arriving in the upstairs living room, Deputy Pond located defendant's wallet

and, after receiving defendant's consent, pulled his identification out of the

wallet.   Id. at 05:17:55 – 05:18:30.   The identification bore the name "Dane

Arredondo" and Deputy Pond told defendant that he had given a different name.[8]

Id.   Deputy Pond instructed defendant to put shoes on and took him out of the

house (and off camera).   Id. at 05:18:32, 05:19:36.   Shortly after defendant was

---

[8]"[O]ffering a fictitious name . . . with intent to deceive a law enforcement
officer" is a misdemeanor under South Dakota law.   SDCL § 22-40-1.

taken out of the house, the video showed a liquor bottle, apparently empty, lying on the living room floor.[9]  Id. at 05:20:01.

Deputy Fenton informed Mr. Arredondo they would "be out of here shortly[.]"  Id. at 05:21:15.  Approximately 30 seconds later, a clinking sound is heard on the video and Deputy Fenton is shown picking up small vials off of a couch.[10]  Id. at 05:21:34 – 05:21:42.  Deputy Fenton asked Mr. Arredondo what the vials were.  Mr. Arredondo responded that "he"—presumably referring to defendant—is a paramedic.  Id.  After picking up one of the vials, Deputy Fenton is recorded asking if defendant has a prescription for ketamine.  Id. at 05:21:46.  He then asked Mr. Arredondo if defendant was "on ketamine right now" and Mr. Arredondo denied it.  Id. at 05:22:03 – 05:22:13.  Deputy Fenton noted the vials were empty.  Id.  In total, Deputy Fenton held up six vials in view of the camera.  Id. at 05:21:28 – 05:22:13.

Deputy Fenton testified he "kind of knew what ketamine was" but that he had to search the internet to see whether it was a controlled substance.  (Docket 38 at p. 16).  The video shows Deputy Fenton using his cell phone to access Google.  Ex. 1 at 05:22:30, 05:26:51.  Approximately three minutes after

---

[9]Deputy Fenton testified he did not recall seeking "any liquor or alcohol bottles" in the home.  (Docket 38 at p. 47).  The liquor bottle was clearly visible to Deputy Fenton while he was searching a couch before placing Mr. Arredondo on it.  Ex. 1 at 05:20:01 – 05:20:08.

[10]The video does not show the vials before Deputy Fenton picked them up.  It is apparent he picked the vials off the couch, but the video does not show if he had to move other items on the couch to see the vials.  Deputy Fenton testified the vials were in plain view, "[lying] on the couch."  (Docket 38 at p. 16).

Deputy Fenton first observed the vials, Deputy Pond is shown on video coming back upstairs.  Id. at 05:24:43.  Deputies Fenton and Pond, along with an unidentified third male officer, discussed whether defendant was permitted to possess the ketamine because he was a paramedic.[11]  Id. at 05:24:50 – 05:25:13.  Deputy Pond stated "he"—presumably defendant—said "they weren't empty."  Id.  Deputy Fenton stated defendant was going to jail for the false impersonation.  Id. at 05:25:20.  Deputy Pond is then shown leaving the living room.  Id. at 05:26:50.

Approximately two and a half minutes after leaving the upstairs, Deputy Pond returned from the basement.  Id. at 05:29:25.  He informed Deputy Fenton he found fentanyl and showed him a small vial.[12]  Id. at 05:29:30. Deputy Fenton then muted his body camera to "talk to" Deputy Pond.  Id. at 05:29:35.  He gave no other reason for muting the camera.  The camera remained muted for approximately three minutes.  Id. at 05:32:54.  No party asked Deputy Fenton at the evidentiary hearing why he muted his body camera or what matters were discussed during the muted period.

---

[11]The third officer may have been Deputy Buckhold.  (Docket 38 at p. 40). The record contains no information about Deputy Buckhold's first name or law enforcement credentials.

[12]The record contains little information about where or how Deputy Pond seized the fentanyl.  Deputy Fenton testified he did not know "what [Deputy Pond] was doing when he found" the fentanyl.  (Docket 38 at p. 41).  The government's briefing states only that Deputy Pond "saw" the fentanyl vial when he "returned to the house to talk to [Ms.] Richards[.]"  (Docket 32 at p. 3).

After Deputy Fenton unmuted his body camera, it recorded the following conversation between him and Deputy Pond:

Deputy Fenton: What are you thinking, Pond? Just take older brother since he's the resident? Take him to jail? The one that false pers'd you?

Deputy Pond: Uh-huh.

Deputy Fenton: For essential PCS and false pers?

Deputy Pond: I gotta look at the PCS form.

Deputy Fenton: Oh, I'm sure it will be, though.

Deputy Pond: No, I know they're controlled. But the regulation on it.

Deputy Fenton: What do you mean?

Deputy Pond: Cuz he's a paramedic. The packs, that they're, they can have.

. . .

Deputy Fenton: I'm sure he might be legal to have, like, full vials. But a bunch of empty ones, and it's only the good stuff that's empty, you know? That's a little strange, right?

Id. at 05:35:05 – 05:36:24.[13]

Shortly before the end of the video, a female deputy, unidentified by the parties but wearing a Pennington County Sheriff's Department uniform with the name "Visan," gave Deputy Fenton an update on Ms. Richards. Id. at 05:44:38

---

[13]The court transcribed this conversation from the video. The court deduces "false pers" refers to false impersonation and "PCS" refers to possession of controlled substances.

– 05:44:58. Deputy Visan stated Ms. Richards "just freaked out" and did not get hurt. Id. She stated Ms. Richards was "worse" when she drinks. Id.

## C. Analysis

The government asserts Deputy Fenton's warrantless seizure of the vials was lawful under the plain view doctrine. (Docket 46 at pp. 1-2). Under the plain view doctrine, "officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." Riggs v. Gibbs, 923 F.3d 518, 523 (8th Cir. 2019) (quoting United States v. Brown, 653 F.3d 1022, 1027 (8th Cir. 2011)). The court agrees with the government that Deputy Fenton was lawfully in defendant's living room when he observed the vials and had a lawful right of access to the vials, but concludes the vials' alleged incriminating nature was not immediately apparent.

### 1. Community caretaker and exigent circumstances exceptions

It is undisputed that law enforcement did not have a warrant to enter defendant's home on January 5, 2019. (Docket 38 at p. 38). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation omitted). However, defendant conceded that Deputy Fenton's warrantless entry was justified under the exigent circumstances exception to the Fourth Amendment's warrant

requirement.  (Docket 38 at p. 51).  The magistrate judge adopted this position, concluding the possibility of injury to Ms. Richards was an exigent circumstance justifying warrantless entry.  (Docket 41 at p. 8).  No party objects to her ruling. The ruling is not clearly erroneous and the court likewise adopts it.[14]

The magistrate judge, however, concluded the exigent circumstances abated before Deputy Fenton observed and seized the vials.  Id. at pp. 8-9.  She therefore proceeded to consider and reject the government's argument that the community caretaker exception to the warrant requirement permitted Deputy Fenton to be in the living room when he observed and seized the vials.  Id. at pp. 9-14.  The government objects to the magistrate judge's dismissal of its community caretaker theory.  (Docket 46 at pp. 21-24).

As detailed below, the court concludes defendant gave Deputy Fenton and the other officers consent to enter the upstairs area of his home.  See infra Section I.C.2.  Whether Deputy Fenton was lawfully in the living room as a community caretaker is moot.  The court accordingly overrules the government's first objection and declines to adopt the R&R's conclusion on this point.

---

[14]A district court's standard of review of a magistrate judge's ruling to which no party objects is poorly defined in the Eighth Circuit.  See Boss v. Ludwick, 863 F. Supp. 2d 845, 852-53 (N.D. Iowa 2012) (concluding review for clear error is prudent under Supreme Court and Eighth Circuit precedent).  The court applies a clear error standard of review.

## 2.  Abatement of the exigency and consent

The government objects to the magistrate judge's ruling that the exigency related to Ms. Richards' wellbeing abated before Deputy Fenton observed and seized the vials.   (Docket 46 at pp. 14-20).   The magistrate judge concluded the exigency ended after defendant and Mr. Arredondo were handcuffed and Deputy Fenton observed no injuries on Ms. Richards.   (Docket 41 at p. 8).   She also relied on Deputy Fenton's admission at the evidentiary hearing that the exigency was "gone" after he and Deputy Pond brought defendant and Mr. Arredondo upstairs.   Id. at pp. 8-9 (citing Docket 38 at p. 36).   The government contends the magistrate judge's ruling "draws far too stringent a line on when the danger was present and when it ended."   (Docket 46 at p. 20).

Setting the debate over the scope of the exigency-justified entry aside, the record shows defendant clearly consented to Deputy Fenton entering the living room.

> An individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion. Voluntary consent may be express or implied.  Consent may be inferred from the defendant's words, gestures, or other conduct, and the ultimate inquiry is not whether the defendant subjectively consented, but whether a reasonable officer would believe consent was given.

United States v. Rodriguez, 834 F.3d 937, 940 (8th Cir. 2016) (internal quotations and citations omitted).   The body camera video shows defendant spontaneously asking no less than five times for the officers to take him upstairs. Ex. 1 at 05:12:01 – 05:13:41.   When Deputy Pond asked defendant for

identification, defendant began walking up the stairs, leading the officers behind him. Id. at 05:17:05. There is no indication the officers coerced defendant into making his requests or forced him into walking upstairs. A reasonable officer would easily infer from defendant's repeated requests and his actions in leading the officers upstairs that he voluntarily consented for the officers to move into the upstairs living room.

Because defendant consented to Deputy Fenton entering the living room, whether the exigency involving Ms. Richards would also have justified entry is immaterial. The court rejects the R&R's conclusion that the exigency abated before Deputy Fenton observed and seized the vials as moot. The government's second objection is sustained on alternative grounds.

### 3. Plain view

As set forth above, Deputy Fenton and the other officers were permitted to enter defendant's residence under the exigent circumstances doctrine and had defendant's consent to enter the upstairs living room. The first prong of the plain view doctrine—whether Deputy Fenton was "lawfully in [the] position from which [he] view[ed] the" vials—is met. Riggs, 923 F.3d at 523. The court next must consider the other two prongs: whether Deputy Fenton had "a lawful right of access" to the vials and whether "the incriminating character of the [vials was] immediately apparent[.]" Id.

The magistrate judge concluded Deputy Fenton did not have a lawful right of access to the vials because he was illegally in the home after the exigency

ended.  (Docket 41 at p. 14).  She declined to determine whether the vials'

incriminating character was immediately apparent.  Id. at pp. 14-15.  The

government argues Deputy Fenton had lawful access to the vials on the couch

and that his confusion over the vials' contents did not obviate their incriminating

character.[15]  (Docket 46 at pp. 11-14).  The court agrees Deputy Fenton had

lawful access to the vials, but finds they did not have an immediately apparent

incriminating character.

The lawful access requirement "prevent[s] officers from entering private

property to seize contraband that can be seen in plain view from outside the

property, no matter how incriminating the contraband."  Faulkner Cty., Ark.,

630 F.3d at 1103.  It is not enough that Deputy Fenton was lawfully standing in

the spot from which he viewed the vials; he also had to have been able to

physically seize the vials lawfully.  The body camera video shows Deputy Fenton

picking the vials off the couch.  Ex. 1 at 05:21:34 – 05:21:42.  He testified the

vials were plainly visible on the couch.  (Docket 38 at p. 16).  While the camera

does not show the vials before Deputy Fenton began picking them up, there is

nothing in the record to contradict his testimony that the vials were in plain

---

[15]The government also asserts the magistrate judge erred in characterizing
Deputy Fenton's actions as a search.  (Docket 46 at pp. 9-11).  Referring to
viewing items in plain view as a search "reflects [a] common misunderstanding"
of the plain view doctrine.  PPS, Inc. v. Faulkner Cty., Ark., 630 F.3d 1098, 1102
(8th Cir. 2011).  While the doctrine may justify an object's seizure, it "has no
relevance to a search because it does not implicate any privacy concerns."  Id.
The government is correct that Deputy Fenton did not conduct a search by
viewing the vials, but the distinction is immaterial in this case.  The court's
analysis focuses on Deputy Fenton's seizure of the vials.

view.[16]   The court concludes Deputy Fenton had a lawful right of access to the vials.

The vials, however, did not have an immediately apparent incriminating character.

> [A]n item's incriminatory nature is immediately apparent if the officer at that moment had probable cause to associate the property with criminal activity . . . meaning the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime.  Probable cause requires only a practical, nontechnical probability that incriminating evidence is involved, but the officer may not manipulate the item in order to ascertain the incriminating character where it is not immediately apparent to him.

United States v. Craddock, 841 F.3d 756, 759 (8th Cir. 2016) (internal quotations, alterations and citations omitted).   In general, "[t]he officer's subjective motivation is irrelevant" in resolving Fourth Amendment challenges. Brigham City, 547 U.S. at 404.   The Supreme Court's "Fourth Amendment jurisprudence . . . ask[s] only whether the circumstances, viewed *objectively*, justify the action."   Kentucky v. King, 563 U.S. 452, 464 (2011) (internal quotation omitted) (emphasis in original).

When Deputy Fenton picked up the medical vials, it was only apparent they had once contained medication.   Without further investigative efforts, it could not have been obvious that the vials were illegal.   The vials could have

---

[16]There is no evidence that a further search, such as moving couch cushions or opening a closed container, was necessary for Deputy Fenton to access the vials.   See United States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008) ("Ordinarily, a warrant is necessary before police may" access items "conceal[ed] . . . from plain view[.]").

been prescribed to a resident of the house or defendant could have legitimately possessed them in the course of his employment. The vials were not self-evidently illicit in the same manner as a bag of marijuana or a methamphetamine pipe.[17] The vials themselves did not establish probable cause to suspect criminal activity.

Although the officers' subjective knowledge of the vials' supposed incriminatory character is not controlling in the court's analysis, the confusion the officers exhibited on scene sheds light on how an objective officer would have viewed the vials. The officers did not know if the vials were illegal on scene. Deputy Fenton had an idea that ketamine was a potentially illicit substance, but he had to conduct internet searches and discuss the issue with his colleagues before determining if the vials might be evidence of a crime. Deputy Fenton and the other officers had a hunch the vials could be incriminating, but nothing more.[18]

Nor did the circumstances of Deputy Fenton's entry into defendant's home provide probable cause his possession of medical vials was criminal. Deputy Fenton entered defendant's home to perform a wellness check on Ms. Richards related to possible domestic violence. He discovered that Ms. Richards and Mr.

---

[17]Ketamine is a Schedule III controlled substance under federal law. 21 C.F.R. § 1308.13(b)(7). It is illegal to possess ketamine unless it was "obtained directly, or pursuant to a valid prescription or order, from a practitioner . . . or except as otherwise authorized[.]" 21 U.S.C. § 844(a).

[18]See Ex. 1 at 05:36:13 (Deputy Fenton saying, "I'm sure he might be legal to have, like, full vials. But a bunch of empty ones, and it's only the good stuff that's empty, you know? That's a little strange, right?")

Arredondo were intoxicated, but, prior to observing the vials, found no evidence suggesting anyone in the house illegally possessed controlled substances.[19] Simple intoxication of residents provides no probable cause to assume a home contains illicit drugs. The government adduced no evidence that any of the residents were noticeably under the influence of ketamine, as opposed to alcohol.[20] Alcohol intoxication in one's own home is neither illegal nor uncommon enough to justify suspicion. Cf. Craddock, 841 F.3d at 760 (finding key fob was not inherently suspicious because of its common usage). Nor did any of the residents make any statements suggesting the vials were associated with criminal activity. In fact, the only relevant statement made on scene—that defendant was a paramedic—lessen, if anything, any suspicion that the vials were illicit.

A comparison of this case with cases in which the Supreme Court and the United States Court of Appeals for the Eighth Circuit rejected seizures under the

---

[19]The government states defendant was intoxicated at multiple points in its briefing. (Dockets 32 at pp. 3, 8 & 46 at pp. 11 n.8, 18). Deputy Fenton did not testify defendant was intoxicated. The magistrate judge did not find defendant was intoxicated. The video shows defendant acting oddly at times, but the court cannot say for certain whether he was intoxicated. In any event, even if defendant was intoxicated, that would not show probable cause to believe he illegally possessed controlled substances.

[20]Ketamine is an anesthetic abused for its hallucinogenic properties. See Drug Enf't. Admin., Drugs of Abuse: A DEA Resource Guide, 68-69 (2017), available at https://www.dea.gov/sites/default/files/sites/getsmartabout drugs.com/files/publications/DoA_2017Ed_Updated_6.16.17.pdf (last visited Feb. 6, 2020). The government adduced no evidence showing any resident was hallucinating, nor does the video suggest any resident was hallucinating.

plain view doctrine illustrates the court's ruling.   In <u>Arizona v. Hicks</u>, officers entered an apartment under exigent circumstances—investigating a shooting—and observed "expensive" stereo equipment "which seemed out of place in the squalid and otherwise ill-appointed four-room apartment."   480 U.S. 321, 323 (1987).   An officer suspected the stereo was stolen and manipulated it to obtain a serial number, which he read to dispatch.   <u>Id.</u>   The Supreme Court held manipulating the stereo to record its serial number without probable cause to believe the stereo was stolen was unconstitutional.   <u>Id.</u> at 326-27.   The Court rejected the idea that reasonable suspicion—as opposed to probable cause—could justify a "cursory inspection" of an item found in plain view to investigate its incriminating nature.   <u>Id.</u> at 328-29.   In dissent, Justice O'Connor argued the court's holding would prevent officers from "picking up or moving objects for a better view" without probable cause.   <u>Id.</u> at 336.

Here, Deputy Fenton picked up the vials to inspect them and had to search on the internet for information about the nature of the medications they contained.   His entry into the house for a wellness check related to potential domestic violence provided no probable cause to suspect defendant illegally possessed controlled substances.   The vials in this case are thus similar to the stereo in <u>Hicks</u> in that the circumstances in each case did not provide probable cause to further investigate the items for illegality.

Two Eighth Circuit cases make the same point.   In <u>United States v. Lewis</u>, officers entered a work area of a tattoo parlor and seized a handgun that was in

plain view, all without a warrant.  864 F.3d 937, 940 (8th Cir. 2017).  The

officers found out after seizing the gun that Mr. Lewis, an employee at the parlor,

was a felon.  Id.  The Eighth Circuit reversed the district court's order denying

suppression because the gun's incriminating nature was not immediately

apparent at the moment officers seized it.  Id. at 944.  The officers, not knowing

Mr. Lewis was a felon, had no reason to believe the gun was contraband.  Id.

In Craddock, an officer observed a stolen vehicle and followed it, but lost

sight of the vehicle for a few minutes.  841 F.3d at 758.  The officer observed

Mr. Craddock walking down a street on which the vehicle was parked.  Id.  The

officer conducted a Terry[21] stop of Mr. Craddock and frisked him, feeling what he

believed to be a key fob.  Craddock, 841 F.3d at 758.  The officer pulled a key

fob out of Mr. Craddock's pocket and determined it unlocked the stolen vehicle.

Id.  The Eighth Circuit reversed the district court's order denying suppression,

concluding the officer's seizure of the key fob exceeded the scope of a Terry frisk

because the fob's "incriminating [nature] was not immediately apparent upon

plain feel."  Id. at 759.  The facts provided no basis for probable cause to

associate Mr. Craddock and the key fob with the stolen vehicle before the officer

seized it.  Id.

The vials here are similar to the gun in Lewis and the key fob in Craddock.

At the time of seizure, the gun and key fob had no immediately apparent

incriminatory nature because no probable cause existed to associate those items

---

[21]Terry v. Ohio, 392 U.S. 1 (1968).

with criminality.   Here, as with the gun and the key fob, the vials were later determined to be, in the government's view, incriminatory.   But when Deputy Fenton seized the vials, an objective officer would only have known that they had a medical character and were sitting in the home of a paramedic.   With those facts, an officer would have, at most, reasonable suspicion that the vials were incriminatory.   Reasonable suspicion is insufficient in order to seize the vials. Deputy Fenton needed probable cause associating them with illegal activity. Hicks, 480 U.S. at 326.   This, he did not have.

The government argues Deputy Fenton had probable cause to "pick up and examine the vials" because of "[t]he presence of empty pharmaceutical-grade vials lying on the couch, as opposed to over-the-counter pill bottles, coupled with the presence of three highly inebriated persons[.]"   (Docket 46 at p. 11 n.8). The government also asserts the fact Deputy Fenton had to conduct an internet search to determine if ketamine was a controlled substance does not cut against a finding that the vials were incriminating.   Id.   These arguments are unpersuasive.

The fact the vials were medical in nature does not indicate they were illicit. Many medicines are not packaged in over-the-counter pill bottles.   And, of course, the officers knew defendant was a paramedic with access to medicines. The presence of empty medical vials does not, by itself, create probable cause for a seizure.   Nor does the fact intoxicated persons were in the residence create

probable cause.   As noted above, there is no evidence associating the residents' intoxication with controlled substances.

The fact that Deputy Fenton had to conduct an internet search to determine the vials had contained controlled substances is of lesser consequence than the other factors discussed in this order.   The court agrees with the government that conducting an internet search "is not the same as conducting some further search for the object itself[.]"   (Docket 46 at p. 11 n.8).   But the internet search and other indicia of confusion Deputy Fenton and the other officers displayed on scene support the conclusion that a reasonable officer would not have had probable cause to suspect the vials were incriminatory on sight.   Further investigation was required to develop probable cause to seize the vials.

The court finds Deputy Fenton was lawfully in the upstairs living room of defendant's home when he observed the vials, but concludes he did not have probable cause to associate the vials with criminality.   Thus, the vials did not have an immediately apparent incriminatory character.   Deputy Fenton's seizure of the vials violated the Fourth Amendment.   As "evidence seized during an unlawful search[,]" the vials cannot "constitute proof against the victim of the search."   Wong Sun v. United States, 371 U.S. 471, 484 (1963) (internal citation omitted).   The court suppresses use of the vials at trial.

### 4. Fentanyl and other drugs

Defendant moved to suppress "evidence derived from an illegal search of Defendant's home," which presumably includes the fentanyl. (Docket 21 at p. 1). As noted above, the government declined to elucidate the origin of the seized fentanyl. The video only shows Deputy Pond returning upstairs from the basement with the alleged fentanyl. Ex. 1 at 05:29:30. There is no basis in the record for the court to determine the fentanyl's origin with additional specificity.

"As with any warrantless search, the Government bears the burden of demonstrating the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." United States v. Kennedy, 427 F.3d 1136, 1144 (8th Cir. 2005). The government did not meet that burden with respect to the fentanyl. While Deputy Pond was lawfully in the basement of defendant's home, that alone is insufficient to show the fentanyl was lawfully seized. If the fentanyl were, for example, seized from a closet or a closed container in the basement, the government would have to show something other than the exigent circumstances present on the current record to justify the additional search. See Banks, 514 F.3d at 773. If the fentanyl were seized in plain view, the government would have to show the fentanyl had an immediately apparent incriminatory character. Craddock, 841 F.3d at 759. The government did not make either showing.

Defendant asserts Deputy Pond located two vials of ketamine, two vials of ondansetron and "vials" of tranexamic acid on a bedroom windowsill.[22]   (Docket 22 at p. 4).   He does not specify which bedroom the vials were found in.   The government merely states Deputy Pond "saw empty medicine vials" when he "returned to the house to talk to [Ms.] Richards[.]"   (Docket 32 at p. 3).   The government provided no evidence these vials had an immediately apparent incriminating character.   Craddock, 841 F.3d at 759.   They must also be suppressed.

The fentanyl and the vials allegedly seized from a bedroom windowsill are suppressed and may not be used as evidence at trial.

## II.   Dismissal R&R

Defendant moved to dismiss the indictment for lack of specificity and for failure to state an offense under Federal Rules of Criminal Procedure 12(b)(3)(B)(iii) & (v).   (Dockets 23 & 24 at pp. 2-6).   He asserts the government did not allege with particularity his fraudulent intent or possession concerning the controlled substances.   (Docket 24 at pp. 2-6).   In the alternative, defendant moved for a bill of particulars to supply the missing information.   Id. at pp. 6-7.   The government opposed both requests.   (Docket 33).

---

[22]Ondansentron is used to treat nausea associated with cancer treatment. Mayo Clinic, Drugs and Supplements: Ondansetron, available at https://www.mayoclinic.org/drugs-supplements/ondansetron-oral-route-oromucosal-route/description/drg-20074421 (last visited Feb. 6, 2020). Tranexamic acid treats heavy menstrual bleeding.   Mayo Clinic, Drugs and Supplements: Tranexamic Acid, available at https://www.mayoclinic.org/drugs -supplements/tranexamic-acid-oral-route/description/drg-20073517 (last visited Feb. 6, 2020).   Neither drug appears to be a controlled substance.

The magistrate judge recommended denying both motions. (Docket 40). No party objected to the dismissal R&R. As noted above, the court reviews an R&R for clear error in the absence of objections. See supra note 14. The court thoroughly reviewed the dismissal R&R and found no error, clear or otherwise.[23] The court adopts the dismissal R&R in full. Defendant's motion to dismiss the indictment and his alternative motion for a bill of particulars are denied.

**ORDER**

For the reasons given above, it is

ORDERED that the government's objections to the magistrate judge's report and recommendation concerning defendant's motion to suppress (Docket 46) are overruled in part and sustained in part.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation concerning defendant's motion to suppress (Docket 41) is adopted in part, as modified by this order, and rejected in part.

IT IS FURTHER ORDERED that defendant's motion to suppress (Docket 21) is granted to the extent described in this order.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation concerning defendant's motion to dismiss or, in the alternative, for a bill of particulars (Docket 40) is adopted in full.

IT IS FURTHER ORDERED that defendant's motion to dismiss or, in the alternative, for a bill of particulars (Docket 23) is denied.

---

[23]The court would also affirm the dismissal R&R upon de novo review.

IT IS FURTHER ORDERED that a scheduling order returning this case to the trial calendar shall issue.

Dated February 13, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE